# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 1, 2025

Lyle W. Cayce
Clerk

No. 21-11170

TitleMax of Texas, Inc.; Ivy Funding Company, L.L.C.;
NCP Finance Limited Partnership,

*Plaintiffs—Appellants*,

*versus*

City of Dallas,

*Defendant—Appellee*.

---

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:21-CV-1040

---

Before Wiener, Richman, and Willett, *Circuit Judges*.

Priscilla Richman, *Circuit Judge*:

The City of Dallas passed an amendment to one of its previously enacted ordinances (the Amending Ordinance) that further expanded its regulation of the short-term lending industry. TitleMax of Texas, Inc. (TitleMax) argued that the amendment devastated its business in Dallas. TitleMax brought suit for declaratory and injunctive relief arguing that the Amending Ordinance was preempted and that it violated TitleMax's due course of law guarantee under the Texas Constitution. It moved for a preliminary injunction against enforcement of the Amending Ordinance until

No. 21-11170

a trial on the merits. The district court denied TitleMax's request. TitleMax appealed. We affirm.

## I

Chapter 393 of the Texas Finance Code regulates short-term lending in the state. TitleMax arranges and services two types of loans: title-secured loans and unsecured loans. TitleMax arranges title-secured loans in its capacity as a Credit Access Business (CAB), licensed by the State of Texas under Texas Finance Code § 393.603. TitleMax arranges unsecured loans in a separate capacity as a Credit Services Organization (CSO), registered with the State of Texas under Texas Finance Code § 393.101. CABs are a subset of CSOs.[1]

Prior to January 2021, TitleMax's Dallas stores were subject to regulation under a 2011 City of Dallas ordinance (the 2011 Ordinance). The 2011 Ordinance was passed to regulate CABs physically located in Dallas. Among other restrictions, the 2011 Ordinance limited the amounts that could be loaned relative to a borrower's income. TitleMax modified its loan products to comply with the 2011 Ordinance.

In January 2021, the City amended the 2011 Ordinance. The Amending Ordinance expanded the City's regulatory scheme to include CSOs in addition to CABs. It imposed new restrictions on the short-term lending industry, including: (1) fees charged for unsecured loans cannot exceed 0.1% per day of the outstanding balance of the loan (the fee-cap provision); and (2) loans secured by vehicle titles must be repaid in no more than four installments (or no more than three renewals for a single-payment, title-secured loan), with each payment reducing principal, fees, charges, and

---

[1] *See, e.g.*, *Consumer Serv. All. of Tex., Inc. v. City of Dallas*, 433 S.W.3d 796, 800 & n.2 (Tex. App.—Dallas 2014, no pet.) (citing TEX FIN. CODE § 393.601(2)).

costs by 25% (the repayment requirements).  After the Amending Ordinance was passed, the City stated in its pleadings that these amendments were in part "designed and intended to limit and control the excessive ancillary credit charges and fees charged by credit brokers, credit arrangers, and credit enhancers" and "to assist low-income borrowers and limit the abusive and predatory terms of loan broker fees, assessments, and charges."

TitleMax asserts that the Amending Ordinance severely harmed its business in Dallas.  It contends that the fee-cap provision for unsecured loans meant that it would operate at a loss, which caused it to cease arranging such loans in Dallas.  Regarding the repayment requirements, TitleMax contends that most customers are not confident they will be able to repay one-fourth of the loan and fees within thirty days and therefore are likely to forgo a title-secured loan.  For those customers who did choose to obtain a title-secured loan, TitleMax asserts that the rates of first-payment defaults and ultimate loan charge-offs sharply increased.  TitleMax states that by mid-July 2021, it had decided to close one Dallas store and by early September, it had reduced staffing from two or three team members to one per store.

TitleMax filed a verified petition in state court seeking a judicial declaration that the City (1) exceeded the powers of a Texas home-rule city; (2) impermissibly acted to regulate a subject matter preempted by state statutes; and (3) deprived TitleMax of the due course of law guaranteed by the Texas Constitution and the due process of law guaranteed by the United States Constitution.  TitleMax also sought a temporary and permanent injunction.  The City removed the suit to federal court.  TitleMax then filed a motion seeking a preliminary injunction against enforcement of the Amending Ordinance.

The magistrate judge recommended that the motion for a preliminary injunction be denied.  The judge concluded that although TitleMax had

No. 21-11170

established that it was likely to suffer irreparable harm in the absence of a preliminary injunction, it could not show a substantial likelihood of success on the merits of its claims. The judge did not reach the last two elements of the preliminary injunction analysis. The district court accepted the magistrate judge's recommendation. TitleMax appealed.

## II

The four elements of a preliminary injunction "are mixed questions of law and fact."[2] "[W]e review the factual findings of the district court only for clear error, but we review its legal conclusions de novo."[3] "Although the ultimate decision whether to grant or deny a preliminary injunction is reviewed only for abuse of discretion, a decision grounded in erroneous legal principles is reviewed de novo."[4]

An applicant moving for a preliminary injunction must show:

(1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest.[5]

---

[2] *Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir. 1998) (quoting *Sunbeam Prods., Inc. v. W. Bend Co.*, 123 F.3d 246, 250 (5th Cir. 1997), *abrogated on other grounds by*, *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23 (2001)).

[3] *Id.* (italics omitted) (quoting *Sunbeam*, 123 F.3d at 250).

[4] *Women's Med. Ctr. of Nw. Hou. v. Bell*, 248 F.3d 411, 419 (5th Cir. 2001) (italics omitted).

[5] *Bluefield Water Ass'n v. City of Starkville*, 577 F.3d 250, 252-53 (5th Cir. 2009) (quoting *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 195-96 (5th Cir. 2003)).

No. 21-11170

"In considering these four prerequisites, the court must remember that a preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion."[6]

TitleMax argues that the district court's ruling was flawed because it required TitleMax to make a "heightened" showing of likelihood of success on the merits applicable to mandatory injunctions. TitleMax contends that, because it requested a prohibitory injunction, it was only required to make "some" showing of likely success.

This court has applied a "sliding-scale" analysis to the four preliminary injunction requirements.[7] "[T]he importance and nature of the [likely success on the merits] requirement can vary significantly, depending upon the magnitude of the injury which would be suffered by the movant in the absence of interlocutory relief and the relative balance of the threatened hardship faced by each of the parties."[8] "Where the other factors are strong, a showing of some likelihood of success on the merits will justify temporary injunctive relief."[9] But "when a plaintiff applies for a mandatory preliminary

---

[6] *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974).

[7] *Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975) ("[N]one of the four prerequisites has a fixed quantitative value. Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus."); *see also Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023) (discussing the sliding scale used to evaluate the preliminary injunction requirements).

[8] *Seatrain Int'l*, 518 F.2d at 180.

[9] *Productos Carnic, S.A. v. Cent. Am. Beef & Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980).

5

injunction, such relief 'should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party.'"[10]

Although we agree that the district court erred in applying the heightened standard of proof applicable to mandatory injunctions, we conclude that even under the lower standard of proof applicable to prohibitory injunctions, TitleMax has not shown the requisite likelihood of success. "To show a likelihood of success, [plaintiffs] must present a prima facie case, but need not prove that [they are] entitled to summary judgment."[11] "To assess the likelihood of success on the merits, we look to 'standards provided by the substantive law.'"[12] TitleMax failed to show "some" likelihood of success on its preemption and due course of law claims.

## A

TitleMax argues that the substance of the Amending Ordinance is preempted by state law because it effectively prohibits operation of a business authorized by Texas statutes.

We start with the presumption that a home-rule city's ordinance is valid.[13] But "[a]n ordinance of a home-rule city that attempts to regulate a subject matter preempted by a state statute is unenforceable to the extent it

---

[10] *Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir. 1971) (per curiam) (quoting *Mia. Beach Fed. Sav. & Loan Ass'n v. Callander*, 256 F.2d 410, 415 (5th Cir. 1958)).

[11] *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013).

[12] *Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011) (quoting *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990)).

[13] *Powell v. City of Houston*, 628 S.W.3d 838, 842 (Tex. 2021); *In re Sanchez*, 81 S.W.3d 794, 796 (Tex. 2002) (per curiam).

No. 21-11170

conflicts with the state statute."[14]    However, "the mere fact that the legislature has enacted a law addressing a subject does not mean the complete subject matter is completely preempted."[15]    "[A] general law and a city ordinance will not be held repugnant to each other if any other reasonable construction leaving both in effect can be reached."[16]    Preemption will be found when the "Legislature expressed an unmistakably clear intent to preempt the City's power to" regulate a subject matter.[17]    If a city's ordinance "amounts to a virtual prohibition against premises licensed by state laws, such [an] ordinance[] will be held void and unenforceable" as it would necessarily be repugnant to state law.[18]

TitleMax argues that two decisions from a Texas court of appeals, *City of Fort Worth v. McDonald*[19] and *Murphy v. Wright*,[20] support its argument that the Dallas ordinances at issue in the present case are preempted.  But in those cases, the ordinances effectively precluded anyone from conducting the targeted businesses.

In *McDonald*, a city ordinance defined marble boards as a nuisance per se and made their ownership, operation, or exhibition a misdemeanor.[21]    The

---

[14] *City of Houston v. Bates*, 406 S.W.3d 539, 546 (Tex. 2013) (quoting *Dall. Merch.'s & Concessionaire's Ass'n v. City of Dallas*, 852 S.W.2d 489, 491 (Tex. 1993)).

[15] *Dall. Merch.'s*, 852 S.W.2d at 491 (quoting *City of Richardson v. Responsible Dog Owners of Tex.*, 794 S.W.2d 17, 19 (Tex. 1990)).

[16] *Id.* (alteration in original) (quoting *City of Beaumont v. Fall*, 291 S.W. 202, 206 (Tex. [Comm'n Op.] 1927)).

[17] *Bates*, 406 S.W.3d at 547.

[18] *Murphy v. Wright*, 115 S.W.2d 448, 452 (Tex. App.—Fort Worth 1938, no writ).

[19] 293 S.W.2d 256 (Tex. App.—Fort Worth 1956, writ ref'd n.r.e.).

[20] 115 S.W.2d 448 (Tex. App.—Forth Worth 1938, no writ).

[21] *McDonald*, 293 S.W.2d at 258.

ordinance was held to be unenforceable because it was in conflict with a state statute that levied occupation taxes on owners of marble boards.[22] The *McDonald* decision observed, "[C]ourts have held that municipalities have no power to prohibit pursuit of occupations regulated by State law."[23]

In *Murphy*, a city zoning ordinance made it unlawful to "operate a public dance hall within the limits of the City of Denton, Texas, within less than 500 feet from any occupied building, church or school, private residence or place of business."[24] Denton was a "small city," "with residences and business houses constructed in such close proximity to each other that it [was] impossible to conduct [the business of a dance hall] . . . without violating the terms of the ordinance."[25] The Texas court held that because it was "undisputed that there is no place within the city of Denton plaintiff could operate a dance hall and not violate the provisions of the ordinance," it "effectively prohibit[ed]" operating a dance hall anywhere within the city.[26] The Texas court held the ordinance was "a virtual prohibition of conducting a business recognized and licensed by the laws of this state" and therefore that it was "void and unenforceable."[27]

In the case now before us, TitleMax did not provide evidence that the Amending Ordinance prohibits *all* CSOs or *all* CABs from operating, virtually or categorically. TitleMax only asserted that the economic impact on *it* means that it will cease to make certain types of loans. There is no

---

[22] *Id.* at 258-59.

[23] *Id.* at 258.

[24] *Murphy*, 115 S.W.2d at 450.

[25] *Id.*

[26] *Id.* at 452.

[27] *Id.*

evidence that the economic impact of the Amending Ordinance is such that no CSO can operate within its parameters.

The dissenting opinion notes that "unrefuted evidence shows that the [Amending] Ordinance . . . makes it effectively impossible for TitleMax to operate its unsecured-loans business."[28]  TitleMax submitted a series of sworn declarations alleging that the business could no longer profitably offer unsecured loans under the Amending Ordinance and that the Amending Ordinance has led TitleMax to close at least one store.  The dissenting opinion "see[s] no meaningful daylight between this case and *Murphy*."[29]

With great respect, there is an important distinction between the allegations TitleMax made in the declarations—that *its loan business* is untenable under the Amending Ordinance—and the categorical prohibitions of the regulated businesses in *McDonald* and *Murphy*.  TitleMax has not alleged that the Amending Ordinance effectively prohibits all CSOs or CABs in Dallas from profitably operating.  Instead, Titlemax's declarations only speak to the effect of the Amending Ordinance on *its* business; the company alleges that *it* could no longer profitably offer unsecured loans under the Amending Ordinance but does not offer any evidence that other CSOs or CABs cannot operate at a profit.  We do not read *McDonald* and *Murphy* as requiring a city ordinance to be preempted just because one business could not profitably comply, while other competitors might.

Because the Amending Ordinance does not prohibit CSOs or CABs from operating at *all*, but rather regulates their business model, TitleMax has not shown that the City's regulations conflict with a state statute or state laws.  Nor has TitleMax shown that the Texas Legislature expressed clear

---

[28] Post at 18.

[29] Post at 22.

intent to preempt the City's power to enact regulations like the Amending Ordinance.[30] As the magistrate judge reasoned, TitleMax "seem[s] to argue that [Chapter 393's] comprehensive, static structure implies preemption," but TitleMax does not point to any specific provision in Chapter 393 that preempts the Amending Ordinance. We "ascertain the legislative intent from language used within the statute."[31]

TitleMax does not attempt any statutory construction analysis; it does not point to any specific statutory language that evidences clear preemptive intent. Even under the lower standard of proof for prohibitory injunctions, TitleMax has not established a prima facie case of preemption.

**B**

TitleMax contends that the Amending Ordinance violates its due course of law guarantee under the Texas Constitution.

The Texas Constitution provides: "No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land."[32] "This provision encompasses not only procedural, but also substantive due process."[33] "To determine whether a governmental action violates the due

---

[30] *See City of Houston v. Bates*, 406 S.W.3d 539, 547 (Tex. 2013) (analyzing a preemption claim by asking "whether the Legislature expressed an unmistakably clear intent to preempt the City's power" through enactment of statutory provisions).

[31] *State v. Chacon*, 273 S.W.3d 375, 379 (Tex. App.—San Antonio 2008, no pet.); *see also Bates*, 406 S.W.3d at 546-47; *BCCA Appeal Grp., Inc. v. City of Houston*, 496 S.W.3d 1, 8 (Tex. 2016) ("Because the critical inquiry in determining whether an ordinance is preempted is whether the Legislature expressed its preemptive intent through clear and unmistakable language, we begin with statutory construction analysis.").

[32] Tex. Const. art. I, § 19.

[33] *Price v. City of Junction*, 711 F.2d 582, 590 (5th Cir. 1983).

course of law guarantee, [courts] engage in a two-step inquiry."[34]  "First, does the plaintiff have a liberty, property, or other enumerated interest that is entitled to protection?  Second, if a protected interest is implicated, did the government defendant follow due course of law in depriving the plaintiff of that interest?"[35]  "If there is no deprivation of a constitutionally protected interest, then a [law] satisfies the Due Course of Law Clause as long as it is rationally related to a legitimate state purpose."[36]  We conclude that TitleMax does not assert a constitutionally protected interest in this case.

In order to operate as a CAB, TitleMax was required to obtain a license from the Office of Consumer Credit Commissioner.[37]  In order to do business as a CSO, TitleMax was required to register with the Texas Secretary of State.[38]  The Supreme Court of Texas has stated numerous times that a license or permit "is not a vested property right but is a privilege that is granted and enjoyed subject to regulations prescribed by the Legislature."[39]  "[H]owever, once [a license or permit] is granted, it cannot be taken away except for good cause."[40]

TitleMax is not alleging that its license was *taken away* or that its registration was *revoked* without due course of law.  TitleMax is arguing that

---

[34] *Tex. S. Univ. v. Villarreal*, 620 S.W.3d 899, 905 (Tex. 2021).

[35] *Id.* (citations omitted).

[36] *State v. Loe*, 692 S.W.3d 215, 228 (Tex. 2024) (citing *Barshop v. Medina Cnty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 633 (Tex. 1996)).

[37] Tex. Fin. Code § 393.603.

[38] *Id.* § 393.101.

[39] *Tex. Liquor Control Bd. v. Canyon Creek Land Corp.*, 456 S.W.2d 891, 895 (Tex. 1970); *see also Gillaspie v. Dep't of Pub. Safety*, 259 S.W.2d 177, 181-82 (Tex. 1953); *Jones v. Marsh*, 224 S.W.2d 198, 201 (Tex. 1949).

[40] *House of Tobacco, Inc. v. Calvert*, 394 S.W.2d 654, 657 (Tex. 1965).

it has a constitutionally protected interest in carrying out its business as it had been since 2011 or, in other words, carrying out its business profitably.

We start by noting that TitleMax has no vested property interest in its licenses. "[A] 'vested right' is 'something more than a mere expectancy based upon an anticipated continuance of an existing law.'"[41]

The Texas Legislature enacted the Credit Services Organization Act (CSOA) (Texas Finance Code Chapter 393 *et seq.*), which permits loan brokers to charge and collect fees without threat of penalties under the Texas usury laws.[42] But the Legislature required that these brokers comply with licensure and registration requirements.[43] Because TitleMax's right to operate as a CSO or a CAB (which is a subset of a CSO) rests on the Legislature's decision to extend such privileges,[44] TitleMax has no vested property interest.

TitleMax also argues that it possesses "a constitutionally protected interest in pursuing [its] business." However, even "protected work-related interests, although sometimes broadly stated, are not without limits. . . . The

---

[41] *Honors Acad., Inc. v. Tex. Educ. Agency*, 555 S.W.3d 54, 61 (Tex. 2018) (quoting *City of Dallas v. Trammell*, 101 S.W.2d 1009, 1014 (Tex. 1937), *superseded on other grounds by constitutional amendment*, Tex. Const. art. XVI, § 66, *as recognized in*, *Degan v. Bd. of Trs. of Dall. Police & Fire Pension Sys.*, 594 S.W.3d 309, 313-14 (Tex. 2020)).

[42] *See Lovick v. Ritemoney Ltd.*, 378 F.3d 433, 442 (5th Cir. 2004) ("The codification of Texas usury law and the enactment of CSOA governing loan brokers as credit services organizations (CSOs) has overruled by implication those cases interpreting brokerage fees of the type alleged here as potentially usurious interest.").

[43] *See id.* ("CSOA authorizes a CSO to charge a 'credit service fee' by complying with certain requirements . . . . A fee may not be charged if any of these requirements is not met . . . ."); *see also* Tex. Fin. Code § 393.501 (stating that a violation of Chapter 393 is a Class B misdemeanor).

[44] *See Lovick*, 378 F.3d at 442 ("The usury statutes and CSOA work in harmony, permitting a CSO to charge a brokerage fee in connection with its services.").

No. 21-11170

due-course clause is not so broad as to protect *every* form and method in which one may choose to work or earn a living, and some work-related interests do not enjoy constitutional protection at all."[45]  Specifically, "the due-course clause, like its federal counterpart, has never been interpreted to protect a right to work in fields our society has long deemed 'inherently vicious and harmful,'"[46] such as "gambling and racetrack ownership."[47]  In *Crown Distributing*,[48] the Supreme Court of Texas concluded that there was no "liberty interest" in the "manufacture and processing of smokable hemp products" after "[c]onsidering the long history of the state's extensive efforts to prohibit and regulate the production, possession, and use of the *Cannabis sativa L.* plant."[49]

Similarly, the state of Texas has a "long history of . . . extensive efforts to prohibit and regulate"[50] excessive interest rates and usury by regulating the lending industry.  Texas statues regulate lenders and loan brokers, and include provisions regulating interest rates, broker fees, required disclosures, and cancellation notices.[51]  The Texas Constitution expressly grants the Legislature the power to "define interest and fix maximum rates of interest."[52]

---

[45] *Tex. Dep't of State Health Servs. v. Crown Distrib. LLC*, 647 S.W.3d 648, 654 (Tex. 2022).

[46] *Id.* at 655 (*Murphy v. California*, 225 U.S. 623, 628 (1912)).

[47] *Id.*

[48] *Tex. Dep't of State Health Servs. v. Crown Distrib. LLC*, 647 S.W.3d 648 (Tex. 2022).

[49] *Id.* at 664.

[50] *Id.*

[51] *Lovick v. Ritemoney Ltd.*, 378 F.3d 433, 439, 442-43 (5th Cir. 2004).

[52] Tex. Const. art. XVI, § 11.

No. 21-11170

TitleMax responds that it is "entitled to due process/due course of law protection" because the "business of arranging and funding loans certainly is one of the 'common [occupations] of life.'"[53]   This broad statement ignores historical sources noting both Texas's and the nation's long tradition of prohibiting usury and excluding it from the freedom of contract.[54]  The Texas Court of Criminal Appeals wrote over a century ago that "[t]he right to lend money at interest is a creature of statute, not an inherent right," and "[m]any restrictions and regulations with reference to lending money . . . will be found in the banking laws of the United States and the several states."[55]  Nineteenth-century sources even discuss the necessity of regulating emergency loans for borrowers who are "[i]n times of great financial embarrassment."[56]

The sole case that TitleMax cites explains that "*pursuing employment as a manager of a savings and loan*" "is a liberty interest within the ambit of

---

[53] *See Phillips v. Vandygriff*, 711 F.2d 1217, 1222 (5th Cir. 1983).

[54] Timothy Walker, Introduction to American Law 435 (5th ed. 1869) ("[I]n most of the States, *usurious contracts* have also been prohibited.  *Usury* signifies the taking of greater interest than the law allows.  It has been the policy of most nations to limit the rate of interest."); *see also* Ray Pearce & J. McDonald Williams, *Punitive Past to Current Convenience—A Study of the Texas Law of Usury*, 22 Sw. L.J. 233, 235 (1968).

[55] *Juhan v. State*, 216 S.W. 873, 874 (Tex. Crim. App. 1918).

[56] John F. Baker, *On Usury*, 1 Alb. L.J. 431, 450 (1870) ("In times of great financial embarrassment—when money seems to be worth almost any price to the borrower—when men are ready to hypothecate their real estate or stock in trade, and stipulate to pay enormous rates of interest—at such times it is that a law just and equitable should limit the rate of interest.  It is necessary for the security of the community that some rate, commercially just and equitable, should regulate interest, so that the rash borrower or speculator shall be properly curbed in his eagerness to raise money; and thus, while the borrower is restrained, the creditor is protected.").

the fourteenth amendment."[57]  It says nothing about whether a business *operating* as a CSO or a CAB receives the same protections.

The Supreme Court of Texas's recent decision in *State v. Loe*[58] reinforces our conclusion that the ordinance at issue in the present case does not violate the Due Course of Law provision of the Texas Constitution.  In *Loe*, the court held that a state law prohibiting novel medical treatments for children did not implicate parents' "fundamental interest in making decisions regarding the care, custody, and control of their children."[59]  In reaching this result, the court relied on *Washington v. Glucksberg*[60] as "a useful guide" for determining whether an asserted right amounted to a fundamental liberty interest, explaining that fundamental rights and liberties are those "which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed."[61]  The Supreme Court of Texas emphasized in *Loe* that it had "never questioned the Legislature's constitutional authority to regulate medical treatments—including by prohibiting certain treatments outright—for both adults and children."[62]  Accordingly, the court concluded that "to the extent parents possess a fundamental interest in obtaining medical care for their children, it has

---

[57] *Phillips*, 711 F.2d at 1222.

[58] 692 S.W.3d 215 (Tex. 2024).

[59] *Id.* at 227-33.

[60] 521 U.S. 702 (1997).

[61] *Loe*, 692 S.W.3d at 230 (quoting *Glucksberg*, 521 U.S. at 720-21).

[62] *Id.* at 228-29.

extended *only to those medical treatments that are legally available.*[63] Importantly, the court did "not hold that the Legislature could withdraw from parents the authority to choose any legal, available medical treatment."[64] Rather, "[t]he law merely restrict[ed] the availability of new treatments."[65]

In sum, TitleMax has not established that the Due Course of Law provision protects its asserted interests; the privilege to operate as a CSO or a CAB without the threat of liability for usury is not objectively rooted in Texas's or the Nation's history and tradition, or implicit in the concept of ordered liberty. Additionally, the Amending Ordinance's purpose is likely rationally related to a legitimate governmental interest in protecting low-income borrowers.[66] And assuming that we should ask whether the Amending Ordinance's "effect as a whole is so unreasonably burdensome that it becomes oppressive in relation to the underlying governmental interest," TitleMax would not prevail.[67] The ordinance does not erect an

---

[63] *Id.* at 229 (emphasis added); *see also id.* at 231 ("[A] fit parent's fundamental interest in caring for her child free from government interference extends to choosing from among legally available medical treatments, but it never has been understood to permit a parent to demand medical treatment that is not legally available.").

[64] *Id.* at 232.

[65] *Id.* at 233.

[66] *See id.* at 228 ("If there is no deprivation of a constitutionally protected interest, then a statute satisfies the Due Course of Law Clause as long as it is rationally related to a legitimate state purpose.").

[67] *See Patel v. Tex. Dep't of Licensing & Regul.*, 469 S.W.3d 69, 87 (Tex. 2015) (supplying standard); *see also Tex. Dep't of State Health Servs. v. Crown Distrib. LLC*, 647 S.W.3d 648, 653 & n.16 (Tex. 2022) (noting that the court "did not address the first-step issue in *Patel*" and declining to "reach the inquiry's second step" after concluding that "the due-course clause does not protect the [parties'] asserted interest"); *cf. Loe*, 692 S.W.3d at 236 ("We need not decide whether the standard we announced in *Patel* applies here because plaintiffs cannot [satisfy it].").

economic barrier of entry into the business of lending or prevent TitleMax from operating within its chosen trade; rather, the Amending Ordinance regulates the business relationship between TitleMax and its customer base.

## III

Because we conclude that TitleMax did not show a likelihood of success on the merits of its claims, we do not reach the remaining preliminary injunction factors.

\*    \*    \*

The order of district court is AFFIRMED.

No. 21-11170

DON R. WILLETT, *Circuit Judge*, dissenting:

I agree with the majority that TitleMax's due-course-of-law claim falls short. But on preemption, I part company.

The unrefuted evidence shows that the Ordinance does more than merely regulate—it makes it effectively impossible for TitleMax to operate its unsecured-loans business. Whether that conclusion will hold up on a fuller record remains to be seen. But at this early stage, I would hold that TitleMax has made a sufficient prima facie showing of preemption. Accordingly, I respectfully dissent.

\* \* \*

As the majority rightly notes, "[a]n ordinance of a home-rule city that attempts to regulate a subject matter preempted by a state statute is unenforceable to the extent it conflicts with the state statute."[1] This "limitation on the power of home rule cities . . . may be either an express limitation or one arising by implication."[2] And a necessary corollary is that "municipalities have no power to prohibit pursuit of occupations regulated by State law."[3] It follows that an ordinance that "amounts to a virtual prohibition against premises licensed by state laws" is "void and unenforceable."[4]

---

[1] *City of Houston v. Bates*, 406 S.W.3d 539, 546 (Tex. 2013) (quoting *Dall. Merch.'s & Concessionaire's Ass'n v. City of Dallas*, 852 S.W.2d 489, 491 (Tex. 1993)).

[2] *Lower Colo. River Auth. v. City of San Marcos*, 523 S.W.2d 641, 645 (Tex. 1975).

[3] *City of Fort Worth v. McDonald*, 293 S.W.2d 256, 258 (Tex. App.—Fort Worth 1956, writ ref'd n.r.e.); *Accord City of Fort Worth v. Atlas Enterprises*, 311 S.W.2d 922, 926 (Tex. App.—Fort Worth 1958, writ ref'd n.r.e.) ("A business authorized or regulated by state statute cannot be prohibited by city ordinance, and ordinances which are in conflict therewith on the same subject are necessarily void.").

[4] *Murphy v. Wright*, 115 S.W.2d 448, 452 (Tex. App.—Fort Worth 1938, no writ).

18

No. 21-11170

A "virtual prohibition," as the phrase implies, need not be explicit. That principle was settled more than a century ago: "A business which is authorized by the state law cannot be prohibited by city ordinance *directly or indirectly*."[5] So even an ordinance that allows state-licensed businesses in theory is void if it imposes "prohibitory regulation" that renders them inoperable in practice.[6]

*Murphy v. Wright* makes the point unmistakably clear.[7] There, a Texas appellate court reviewed an ordinance that barred dance halls within 500 feet of any occupied building, church, school, private residence, or place of business.[8] It was undisputed that, given those restrictions, the plaintiff could not lawfully operate a dance hall anywhere in the city.[9] Because the ordinance made lawful operation of the plaintiff's business impossible, the court held it was "not a reasonable regulatory measure, but a virtual prohibition of conducting a business recognized and licensed by the laws of this state."[10]

In my view, *Murphy* controls this case.[11] TitleMax is licensed and registered under state law to arrange title-secured loans as a Credit Access

---

[5] *Ex parte Goldburg*, 200 S.W. 386, 387 (Tex. Crim. App. 1918) (emphasis added).

[6] *Id.*

[7] 115 S.W.2d 448.

[8] *Id.* at 452.

[9] *Id.*

[10] *Id.*; *see also City of Wichita Falls v. Abell*, 566 S.W.2d 336, 339 (Tex. App.—Fort Worth 1978, writ ref'd n.r.e.) (holding that a city ordinance prohibiting the sale of alcohol within 300 feet of any church, state-supported public school, parochial school, or public hospital was unlawful because "[i]f the city ordinance were allowed to stand . . . the result would be to make illegal that which is legal under the laws of the State of Texas").

[11] TitleMax also relies on *City of Fort Worth v. McDonald*, 293 S.W.2d 256 (Tex. App.—Fort Worth 1956, writ ref'd n.r.e.). I agree with the majority that *McDonald* is distinguishable. There, the ordinance at issue declared the occupation a nuisance and

No. 21-11170

Business and unsecured loans as a Credit Services Organization. Yet according to TitleMax, the Ordinance makes it "impossible to arrange unsecured loans without losing money." As TitleMax puts it, "in its line of business, a 0.1% per day limitation is effectively . . . a prohibition."

To support that claim, TitleMax submitted two sworn declarations—one from its Compliance Manager and the other from its Senior Vice President of Operations. Those affidavits detail why TitleMax cannot operate a profitable unsecured-loan business while complying with the Ordinance. As the Compliance Manager succinctly put it: "TitleMax determined it was not feasible to arrange unsecured loans with such restriction."[12]

And what does the City say in response? Not much.

It simply notes that the Ordinance doesn't technically bar TitleMax from operating—so long as it toes the line—and contends that the provisions impose "reasonable limits on . . . predatory charges and repayment terms." But tellingly, the City never actually challenges TitleMax's central claim: that the Ordinance makes it impossible to arrange unsecured loans at a profit.

As for the affidavits, the City brushes them aside as "conclusory and unsupported by any evidence." Yet the affidavits are themselves evidence—sworn testimony from seasoned industry professionals with direct, firsthand knowledge of how the Ordinance affects day-to-day operations.[13] The City

---

prohibited it outright—a form of regulation that more closely resembles a direct ban than the ordinance in this case or in *Murphy*.

[12] The affidavits are more equivocal as to whether the Ordinance would, in practice, bar TitleMax from offering title-secured loans. Accordingly, I limit my preemption analysis to the fee-cap provision as it applies to unsecured loans.

[13] *Cf. Cedar Lodge Plantation, L.L.C. v. CSHV Fairway View I, L.L.C.*, 753 F. App'x 191, 198 n.35 (5th Cir. 2018) ("This court has explained that merely claiming that the evidence is self-serving does not mean we cannot consider it or that it is insufficient. Much

No. 21-11170

cites no authority suggesting that sworn declarations should be ignored in evaluating a motion for injunctive relief. Indeed, the district court itself relied on these very affidavits in concluding that the Ordinance posed irreparable harm to TitleMax.

To be sure, TitleMax's affidavits—though unrefuted—do not resolve the matter beyond all doubt. One can imagine counter-evidence—say, proof that other companies have managed to offer unsecured loans despite the Ordinance.[14] And perhaps, on a fuller record, the City will offer just that. But so far, it has offered nothing. A party "is not required to prove his case in full" to obtain a preliminary injunction.[15] And here, the City has offered no evidence to rebut TitleMax's assertions—nor has it directly contested

---

evidence is self-serving and, to an extent, conclusional." (internal quotation marks and citation omitted)).

[14] The majority faults TitleMax for failing to "allege[] that the Amending Ordinance effectively prohibits all CSOs or CABs in Dallas from profitably operating." Ante, at 9. But TitleMax does allege just that. It alleges that "*in its line of business*, a 0.1% per day limitation is effectively such a prohibition." (emphasis added). The real problem, it seems, is not with the allegation but with the evidence supporting that allegation, which the majority dismisses for "only speak[ing] to the effect of the Amending Ordinance on *its* business." *Id*. In my view, that criticism demands too much. TitleMax is not required to speculate about the operations or profit margins of every other CSO in Dallas. It offered what it reasonably could: sworn testimony by industry professionals that the Ordinance renders it "not feasible to arrange unsecured loans." Is that evidence airtight? No. Could the City have challenged it? Yes—but it didn't. In fact, *Murphy* upheld a similar claim based on evidence that "there is no place within the city of Denton *plaintiff* could operate a dance hall and not violate the provisions of the ordinance," 293 S.W.2d at 452 (emphasis added)—not that no one could ever operate a dance hall under any circumstances. TitleMax alleges that the Ordinance effectively bars it from operating its line of business. It supports that claim with unrefuted evidence that the Ordinance makes its business model economically unworkable. That strikes me as more than enough to survive at this stage— especially when the City offers nothing in rebuttal.

[15] *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

TitleMax's assertion that the Ordinance effectively "guarantees monetary losses."

True, the City defends its Ordinance as a "reasonable" means of curbing predatory lending. But reasonableness does not preclude prohibitive effect. A regulation can be entirely reasonable—and entirely destructive to a business's ability to operate.[16] On this record, the unrebutted evidence suggests that complying with the Ordinance and profitably offering unsecured loans are mutually exclusive.

Unlike the majority, I see no meaningful daylight between this case and *Murphy*. As in *Murphy*, the Ordinance here is not styled as an outright ban; TitleMax may, in theory, continue operating—if it complies. But also as in *Murphy*, the unchallenged evidence shows that the Ordinance imposes a "prohibitory regulation" that renders lawful operation unworkable.[17]

On this record, then, I would conclude that the Ordinance functions as a "virtual prohibition" on TitleMax's unsecured-loan business—and that TitleMax has therefore made a prima facie case of preemption.

Because the district court found no likelihood of success on the merits—including on preemption—it did not reach the remaining two prongs of the preliminary-injunction analysis, both of which "implicate the discretion of that court to craft a remedy and weigh the evidence."[18] So while I believe TitleMax has shown a likelihood of success on the merits (at least as

---

[16] *See, e.g.*, *Davidson v. City of Clinton*, 826 F.2d 1430, 1434 (5th Cir. 1987) (noting that with respect to alcohol sales, it is within the state's police power "to regulate the business, to mitigate its evils, or to suppress it entirely") (quoting *Crowley v. Christensen*, 137 U.S. 86, 91 (1890)).

[17] *Ex parte Goldburg*, 200 S.W. at 387.

[18] *Janvey v. Alguire*, 647 F.3d 585, 601 (5th Cir. 2011).

No. 21-11170

to the fee-cap provision on unsecured loans), that alone does not entitle it to injunctive relief. When a court of appeals disagrees with the district court's denial of a preliminary injunction based on lack of success on the merits, but the district court never addressed the remaining injunction factors, the proper course is to remand.[19] I would do the same here.

With deepest respect, I dissent.

---

[19] *See Tatro v. State of Texas*, 625 F.2d 557, 558 n.1 (5th Cir. 1980); *cf. Robinson v. Hunt Cnty.*, 921 F.3d 440, 452 (5th Cir. 2019) (holding that when a district court's denial of a preliminary injunction is reversed as erroneous and unresolved issues remain, the appropriate course is to "remand for the district court to reconsider [the movant's] preliminary injunction motion").