# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 16, 2025

Lyle W. Cayce
Clerk

————————

No. 24-20571

————————

WorldVue Connect Global, L.L.C.; WorldVue Connect, L.L.C.,

*Plaintiffs—Appellees*,

*versus*

Jason Szuch; Szuch Holdings, L.L.C.; Hospitality Wifi International; Hospitality WiFi LATAM S. de R.L. de C.V.; Shan Griffin,

*Defendants—Appellants*.

————————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:24-CV-4790

————————————————————

Before Smith, Dennis, and Richman, *Circuit Judges*.

Priscilla Richman, *Circuit Judge*:

In this interlocutory appeal, parties to an agreement that pertained to the sale of a business challenge a preliminary injunction granted by the district court to enforce non-solicitation and non-compete provisions. We modify the language of the injunction to clarify the definition of confidential information but otherwise affirm the district court's order.

No. 24-20571

# I

Unless otherwise indicated, we will refer to the appellants, Jason Szuch; Szuch Holdings, L.L.C.; Hospitality Wifi International; Hospitality WiFi LATAM S. de R.L. de C.V.; and Shan Griffin, as "Szuch Parties." We will refer to appellees WorldVue Connect Global, L.L.C. and WorldVue Connect, L.L.C., as "WorldVue," unless otherwise indicated.

WorldVue Connect, LLC., has provided in-room entertainment and other technology to hotels for more than 50 years. Jason Szuch had an interest in entities that installed, serviced, and supported entertainment systems and wireless internet networks for hotels and other clients in the hospitality industry both domestically and internationally.

In 2022, WorldVue purchased the assets of Szuch's domestic business, Hospitality WiFi, LLC, for $9,450,000. Under the Asset Purchase Agreement, Szuch received a 30% minority interest in a new company, WorldVue Global, LLC, to be held by Szuch Holdings, LLC. The purchase agreement did not include Hospitality WiFi's international business affiliates. WorldVue acquired all of the domestic business's "goodwill," "trade secrets" and "intangible items, including the goodwill of the Business as a going concern." An important element of the transaction was a highly trained, remote technical support team. The CEO of WorldVue explained at the hearing that the business it acquired from Szuch Parties "was not generating a lot of cash flow," but a "very valuable piece of the business was the service side of the business. We thought it would help project us into other brands, it would help us with other opportunities, and that's why it was attractive to us." After the transaction, Jason Szuch became CEO of the new combined company, and Hospitality WiFi employees, including Shan Griffin and Brandon Miller, joined WorldVue.

2

No. 24-20571

The business relationship between WorldVue and Szuch deteriorated, and in 2024, WorldVue purchased Szuch Holdings's minority interest for $4,125,000, and executed a settlement agreement with Szuch and his companies (Settlement Agreement) on October 11, 2024. WorldVue also executed a separation agreement with Griffin. Both agreements are governed by Texas law under their terms.

In these contracts, Szuch, Szuch's companies, and Griffin agreed not to compete with WorldVue, solicit its customers, or recruit its workforce for one year. The Settlement Agreement's covenant not to compete stated:

> (b) In exchange for the consideration set forth herein, each person included in the Szuch Group agrees that for one (1) year following the Effective Date, he, she, or it will not, in the United States of America, Canada, Puerto Rico, and the U.S. Virgin Islands (collectively, the "Restricted Area"), directly or indirectly, for themselves or on behalf of or in conjunction with any other Person of whatever nature: . . .

> iii. recruit, solicit, induce or attempt to induce, directly or indirectly, any of the employees or independent contractors of WorldVue or any of its direct or indirect subsidiaries, to terminate their employment or contractual relationship with WorldVue or any such subsidiary . . .

There was an exception for recruiting certain employees, including Shan Griffin, who executed releases or transition agreements with WorldVue, and for recruiting employees who were terminated by WorldVue.

The Settlement Agreement also contained a confidentiality provision that restricted the use of confidential information "for any purposes other than for the purpose of complying with its obligations or exercising its rights under this Agreement" and prohibited the disclosure of confidential information.

3

No. 24-20571

The Settlement Agreement and the agreement with Griffin both include a provision in which the Szuch Parties agreed that breaches of the noncompete covenants could be enforced through injunctions in part "because of the immediate and irreparable damage that could be caused to WorldVue for which it would have no other adequate remedy." The Settlement Agreement also included a provision pursuant to which the parties agreed that the disclosure of confidential information would constitute irreparable harm entitling the party who owned that information to injunctive relief. The Settlement Agreement further provided that the parties "expressly waive[d] . . . any requirement that any other Party prove that breach of this Agreement will cause it irreparable harm or harm for which there is no adequate remedy at law . . . ."

On the same day the Settlement Agreement was signed, individuals at Hospitality WiFi International exchanged emails identifying specific WorldVue employees who Szuch Parties had recruited and how much each of them had agreed they would be paid per week. The email to Jason Szuch providing the names of the individuals and the compensation each would receive said, "I'm selecting those I have closely worked with and I have seen them tackling the worse [sic] problems we have had in support." A few days earlier, Brandon Miller had written an email to Jason Szuch and Griffin explaining that a "regional support manager" had requested access to a control panel for a specific customer. Miller said, "Thoughts guys? I can't add his account as he suggests. That will out us and what is happening behind the scenes to WorldVue." There was other evidence of surreptitious activities of the Szuch Parties. Among that evidence was an email in which Jason Szuch advised a cohort that "As soon as I have the cash [the $4,125,000 payment under the Settlement Agreement], you can pull [a WorldVue worker]." The cohort responded, "soon as you cannot be damaged, we pull all my guys out." Weeks after the Settlement Agreement

4

was consummated, that same cohort wrote "everyone in the group is ready to jump ship" and "I'll sit now and enjoy the fireworks." Just beneath the text was a photo of a fire with the silhouette of an onlooker.

Employees of the Szuch Parties were physically located in the Restricted Area when they solicited WorldVue workers, and the individuals solicited were performing work for WorldVue in the Restricted Area. The evidence reflects that the Szuch Parties planned to recruit call center agents who provided advanced but technical support. These agents worked remotely, living outside the Restricted Area but providing services exclusively to clients in the Restricted Area. Two weeks after signing the Settlement Agreement, four WorldVue personnel had been recruited by Hospitality WiFi, International, and those workers shortly thereafter resigned from WorldVue.

About a month after the Settlement Agreement had been signed, WorldVue filed suit in Texas state court against the Szuch Parties for breach of contract and tortious interference with existing contracts. WorldVue sought declaratory and injunctive relief prohibiting the Szuch Parties from "recruiting, soliciting, inducing, or attempting to induce independent contractors that perform work for Plaintiffs' business conducted in the Restricted Area to terminate their relationship with Plaintiffs" and "using Plaintiffs' confidential information in, among other things, recruiting, soliciting, inducing or attempting to induce Plaintiffs' independent contractors to work for the Szuch Group." WorldVue also sought injunctive relief preventing the Szuch Parties from entering into a contract with or compensating eleven of WorldVue's independent contractors, including the four workers it had already recruited. The state court granted WorldVue a temporary restraining order.

No. 24-20571

After the Szuch Parties removed the suit to federal court, the district court extended the TRO. After reviewing the evidence and briefing, the district court granted WorldVue's application for a preliminary injunction. The district court found that the Szuch Parties "breached the Agreements by, among other things, recruiting, soliciting, inducing and attempting to induce independent contractors, that perform work for Worldvue in the Restricted Areas, to terminate their relationship with Worldvue and enter into contractual relations with the Szuch Group and its related entities." Additionally, it found that "[p]ursuant to the Settlement Agreement, the parties agreed that such conduct . . . would not require proof of irreparable injury in order for WorldVue to obtain injunctive relief."

The court therefore enjoined the Szuch Parties from recruiting WorldVue's employees and independent contractors that "perform work for Plaintiffs in the Restricted Area" and from hiring the eleven independent contractors WorldVue had identified in its petition. The court also found that the Szuch Parties "used Worldvue's confidential information in their recruitment process." The court accordingly also enjoined the Szuch Parties from "possessing, using, maintaining, disclosing to any person or entity or for any purpose, distributing, disseminating, publishing, or revealing any of Worldvue's confidential information." The Szuch Parties timely appealed.

No. 24-20571

## II

We review a preliminary injunction for abuse of discretion.[1] The elements of a preliminary injunction "are mixed questions of law and fact."[2] We review factual findings for clear error and legal conclusions de novo.[3]

To obtain a preliminary injunction, a movant must show:

> (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest.[4]

## A

The Szuch Parties argue that the district court committed three legal errors in determining that there was a substantial likelihood that WorldVue would prevail on the merits. First, the Szuch Parties assert that the court erroneously interpreted the Settlement Agreement to prohibit the solicitation of employees and independent contractors who live and work outside the Restricted Area. Second, the Szuch Parties contend that the district court erred in considering WorldVue's workers to be "employees or independent contractors" subject to the non-solicitation provision because they were officially employed by third-party staffing agencies. Third, they argue that the district court erroneously found the Szuch Parties to have used

---

[1] *TitleMax of Tex., Inc. v. City of Dallas*, 142 F.4th 322, 328 (5th Cir. 2025).

[2] *Id.* (citation omitted).

[3] *Id.*

[4] *Id.* (citation omitted).

7

confidential information in recruiting workers that the Szuch Parties had known prior to their positions at WorldVue.

**1**

The Szuch Parties first contend that the Settlement Agreement should be construed to apply only to individuals who live and work in the Restricted Area. The Szuch Parties argue that the provision should not apply to remote workers who provide services in the Restricted Area but live and work outside the Restricted Area. They contend that the district court effectively added new language into the contract by construing it to apply to employees or independent workers that "*perform work* for Plaintiffs in the Restricted Area". They claim this interpretation "impermissibly erases the contractual 'Restricted Area' limitation."

Matters of contract interpretation are legal issues reviewed de novo.[5] Under Texas law, the "goal of contract interpretation is to ascertain the parties' true intent as expressed by the plain language they used."[6] "A contract's plain language controls."[7] If the language has a clear meaning, "the contract is not ambiguous and will be construed as a matter of law."[8] Courts should "'construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served,' and avoiding unreasonable constructions when possible and proper."[9] Courts should

---

[5] *See Keiland Constr., L.L.C. v. Weeks Marine, Inc.*, 109 F.4th 406, 415 (5th Cir. 2024).

[6] *Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017).

[7] *Id.*

[8] *Id.*

[9] *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015) (quoting *Reilly v. Rangers Mgmt., Inc.,* 727 S.W.2d 527, 530 (Tex.1987)).

therefore "consider the entire writing, harmonizing and giving effect to all the contract provisions so that none will be rendered meaningless."[10]

Subsection 4(b) of the Settlement Agreement begins by providing the temporal and geographic limitations on the noncompete covenants. Both the Restricted Area limitation and the one-year limitation are included in subsection (b) before subparts (i), (ii), and (iii), suggesting that both limitations apply to each subpart.[11] The Szuch Parties argue that, for the Restricted Area limitation, the language "in" the Restricted Area, as applied to subpart (iii) should be interpreted to mean workers who physically reside and work in the Restricted Area. While only a small portion of WorldVue's workers physically reside in the Restricted Area, all of its customer service agents provide direct services to clients in the Restricted Area. The other two (b) subparts (i) and (ii) prohibit the Szuch Parties from activities assisting and supporting Competitive Businesses. The Settlement Agreement defines a Competitive Business as "any business that is engaged in designing, installing, and supporting wired and wireless networks in the Restricted Area." The activities the agreement defined as competitive, and in violation of the noncompete agreement, included "supporting . . . networks in the Restricted Area." Just as the Szuch Parties cannot assist other companies supporting networks in the Restricted Area, regardless of where those competitive businesses are located, they likewise cannot recruit workers who

---

[10] *Id.*

[11] *See, e.g.*, *Krishna v. Life Ins. Co. of N. Am.*, No. 22-20516, 2023 WL 4676822, at *6-7, 6 n.3 (5th Cir. July 21, 2023) (describing and using the "scope of subparts canon of contract construction," which notes that material in unindented text relates to all the following indented subparts) (citing ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 156 (2012)); *see also In re Pirani*, 824 F.3d 483, 495 (5th Cir. 2016) (referencing the scope of subparts canon when interpreting a contract and citing ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 156 (2012)).

currently support networks in the Restricted Area for WorldVue, regardless of where those workers are physically located.

This construction gives similar meaning to the subparts in the same subsection. Further, the contract, in its express language, gives no reason to differentiate between employees and independent contractors who "physically reside and work" in the Restricted Area and workers who physically live elsewhere while providing services to clients in the Restricted Area. Given the contract's broad language ("in" the Restricted Area) and the purpose of the noncompete agreement to protect WorldVue's business in the Restricted Area, including its workers' essential provision of services therein, we agree with the district court's enjoining the Szuch Parties from soliciting employees or independent contractors who "perform work for Plaintiffs in the Restricted Area."

The Szuch Parties argue that the district court's interpretation of the noncompete provision makes the Restricted Area limitation meaningless. Construing the geographic limitation to cover all WorldVue's current customer service agents since those agents all perform work for clients in the Restricted Area, does not render the limitation meaningless. The non-solicitation covenant in subpart (iii) is governed by the Covenants Not to Compete Act.[12] As a covenant not to compete, subpart (iii) was required to have a reasonable geographic limitation.[13] While the extent of the geographic limitation is subject to a reasonableness analysis, the limitation itself is included in the plain language and is not rendered meaningless through an interpretation that is broader than the Szuch Parties argue for. The district court found that the "geographical limits are reasonable, as a matter of law."

---

[12] *See Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 766, 768 (Tex. 2011).

[13] Tex. Bus. & Com. Code Ann. §15.50(a).

WorldVue met its burden to show a substantial likelihood of success on the merits. WorldVue presented evidence that its customer service agents provided services in the Restricted Area, and the geographic limitation thus aligned with the nature of the business.[14] Additionally, the Szuch Parties do not present arguments about the reasonableness of the geographic limitation. WorldVue can further show that the Szuch Parties breached this covenant by soliciting workers who performed services in the Restricted Area.

To the extent the preliminary injunction does not explicitly state a time limit for its prohibition on soliciting WorldVue employees, this part of the injunction ceases to operate after October 11, 2025. The parties agree that the noncompete provision otherwise expires on October 11.

The district court additionally enjoined the Szuch Parties from "entering into any contract, compensating, or utilizing the services" of the eleven named independent contractors of WorldVue. WorldVue adduced evidence showing that the majority of these individuals had been identified by the Szuch Group to be hired, and the Szuch Group had a list of current and proposed salaries and benefits packages for these workers. Several of these individuals were in a group chat discussing the Szuch Parties' business along with the Hospitality WiFi International employee who circulated that initial list of workers to be hired. In light of this evidence, it was not an abuse of discretion for the district court to determine these individuals had likely already been solicited and to enjoin the Szuch Parties from hiring them to prevent the Szuch Parties from receiving the benefit of their breach.

---

[14] *See Vais Arms, Inc. v. Vais*, 383 F.3d 287, 295-96 (5th Cir. 2004) (holding that a nationwide geographic limitation was reasonable due to the "national character of the business," which had nationwide marketing and sales).

No. 24-20571

**2**

The Szuch Parties argue that the customer service agents they solicited were not employees or independent contractors of WorldVue and therefore did not come within the nonsolicitation provision. They contend that the workers in question were employees of one of two third-party staffing companies and highlight provisions in WorldVue's contracts with those companies that specify that WorldVue was not the employer.

Agreeing with the Szuch Parties' argument would exclude the customer service agents from the nonsolicitation agreement entirely despite those agents performing essential work for WorldVue in the operation of its business. As WorldVue notes, the Szuch Parties provide no alternative classification for these workers, if they are neither employees nor independent contractors.[15] Reading these workers out of the contract would create an unreasonable construction.[16] Additionally, these agents can be both employees of the third-party staffing agencies *and* independent contractors of WorldVue.[17] It was not an abuse of discretion for the district court to find that the Szuch Parties breached their agreements with WorldVue by recruiting independent contractors who performed work for WorldVue.

---

[15] WorldVue Br. at 26; *see also Thompson v. Travelers Indem. Co. of R.I.*, 789 S.W.2d 277, 278 (Tex. 1990) (discussing the "test to determine whether a worker is an employee or an independent contractor").

[16] *See Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015) (instructing courts to "avoid[] unreasonable constructions when possible and proper").

[17] *See, e.g., Garza v. Zachry Const. Corp.*, 373 S.W.3d 715, 720 (Tex. App.—San Antonio 2012, pet. denied) (discussing a contract that described the status of a company "and its employees as independent contractors"); *see also Waste Mgmt. of Texas, Inc. v. Stevenson*, 622 S.W.3d 273, 283 (Tex. 2021) (describing situations that involve "staffing agencies who provide workers to client companies who direct them on the job" as the "dual-employment context").

12

No. 24-20571

**3**

The district court's preliminary injunction enjoined the Szuch Group and affiliated entities, employees, and independent contractors from:

> 1. possessing, using, maintaining, disclosing to any person or entity or for any purpose, distributing, disseminating, publishing, or revealing any of Worldvue's confidential information;
>
> 2. accessing, manipulating, copying, disclosing or destroying any of Worldvue's confidential information stored on any electronic device (e.g., laptops, desktop computers, cell phones, tablets, external hard drives, jump drives, flash drives, or other USB drives) or in any cloud storage systems; and
>
> 3. manipulating, deleting, copying, or destroying any emails, text or voice messages, instant messages and social medial communications (to include, without limitation, instant messages using Google Talk, Facebook and Facebook Messenger, LinkedIn, Twitter, AOL Instant Messenger, Yahoo Messenger, or any other instant messaging or social media platform), or any electronic files or communications related to the subject matter of this lawsuit from Defendants' personal or work computer(s), laptop(s), tablet(s), phone(s), electronic storage devices, and/or any other electronic device.

The Parties disagree about the scope of "confidential information" under the Settlement Agreement and accordingly disagree about what is actually enjoined under the district court's preliminary injunction.

The Settlement Agreement defines "Confidential Information" as information that:

> is marked as such, or, by the circumstances of its disclosure would reasonably be deemed confidential, including all information relating to the Disclosing Party's nonpublic technical and marketing information, products, services,

customer information, business affairs, and other proprietary and trade secret information, whether oral, graphic, written, electronic or in machine readable form, including, without limitation, this Agreement, the Purchase Agreement, and any other agreement entered into in connection therewith. . . . Any otherwise Confidential Information of Szuch Group, individually or collectively, acquired by [WorldVue] pursuant to the Asset Purchase Agreement (including without limitation, Confidential Information related to the assets purchased by [WorldVue] pursuant to the Asset Purchase Agreement) shall, for purposes of this Section 5, not constitute Confidential Information of Szuch Group as the Disclosing Party, but rather shall constitute Confidential Information of WorldVue as the Disclosing Party.

The Settlement Agreement explicitly excludes from this definition information that:

(i) was in the public domain before disclosure; (ii) becomes part of the public domain after disclosure by a publication or other means, except by a breach of this Agreement or other applicable confidentiality agreement by the Receiving Party; (iii) was received from a third party under no duty or obligation of confidentiality to a Disclosing Party; or (iv) was independently developed by the Receiving Party without reference to a Disclosing Party's Confidential Information" from the definition of confidential information.

Without specifying which confidential information, the district court concluded in its preliminary injunction that "the Szuch Group and Griffin used Worldvue's confidential information in their recruitment process," and enjoined any such further use. Despite that, as the Szuch Parties correctly point out, the district court stated at the hearing that "[w]ho owns the confidential information that [Szuch] used" is "not relevant to this

proceeding" and that "the matter . . . does not have to do with confidential information."

The Szuch Parties argue that the district court abused its discretion by enjoining them from using information about workers' identities, compensation, and skill level because such information is not confidential. In the district court, WorldVue did not precisely identify the information it believes to be confidential. Discussion about confidential information centered around workers' identities, compensation, and skill level. When WorldVue argued that "confidential information is [Szuch's] knowledge about the employees," the court disagreed and stated that Szuch "knows these people personally. That's not confidential information." The court reasoned: "Because it's not in the company domain, it's in [Szuch's] head. It's in [Szuch's] heart. It's where [Szuch] visits. So unless that has been put into the contract in some way, then it's not confidential information." To which WorldVue's attorney responded, "I get your decision."

The record is ambiguous as to the scope of confidential information the district court enjoined the Szuch Parties from using. The Szuch Parties argue that the information about workers' identities, compensation, and skill levels they used in their recruiting efforts "is not confidential at all" because they "possessed this information since before [the workers'] employment with WorldVue." The information, they argue, is "general knowledge [Szuch Holdings] obtained prior to working with WorldVue." WorldVue responds that "information regarding 'who were the key people' on WorldVue's service teams is properly subject to confidentiality protection." It claims Szuch's prior possession of information is irrelevant because Szuch Holdings sold the information to WorldVue when WorldVue purchased Szuch's domestic business in 2022. Specifically, WorldVue contends that its purchase included *Szuch's* "confidential information, trade secrets, goodwill, and intangible items, including the good-will of the Business as a

going concern," and that this information does not become general knowledge "simply because it changed hands."

In essence, WorldVue argues that because it purchased *Szuch's* knowledge about the employees, it now owns Szuch's knowledge, and Szuch is no longer entitled to use such knowledge. WorldVue supports its argument on three grounds. First, WorldVue's purchase of Szuch's domestic business in 2022 included "[a]ll intellectual property and goodwill . . . including all patents, trade secrets, [and] confidential information . . ." Second, the Parties agreed in their 2024 Asset Purchase Agreement that WorldVue would own "*WorldVue's* employee, vendor, supplier, customer, contractor, end-user, and client lists and relationships and information." Third, the Settlement Agreement's definition of confidential information "made clear" that Szuch's confidential information "belonged to WorldVue."

To the extent the district court's preliminary injunction, when referring to "confidential information" enjoins, if at all, Szuch's use of his personal knowledge about the workers' identities, it is overbroad. In all other respects, the preliminary injunction is proper.

Nondisclosure covenants "do not necessarily restrict a former employee's ability to compete with the former employer."[18] "Nondisclosure covenants do not prohibit the former employee from using, *in competition with the former employer*, the general knowledge, skill, and experience acquired in former employment."[19]  "The nondisclosure covenant prevents only the

_____

[18] *Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 663 (Tex. App.—Dallas 1992, no writ).

[19] *Id.* (emphasis in original).

disclosure of trade secrets and confidential information acquired by the former employee"[20] "*during the course of employment*."[21]

While the 2022 agreement for the purchase of Szuch's domestic business comprised of "intellectual property" that included "confidential information," Szuch's personal knowledge about the workers—which he acquired *before* WorldVue's acquisition—was not part of the "confidential information" WorldVue purchased.[22]    Szuch had well-established relationships with these workers, many of whom worked for Szuch for several years prior to WorldVue's acquisition.    Szuch "got to know them personally" through traveling with them, going out to dinner, and becoming acquainted with their families.    WorldVue's own representative acknowledged that Szuch had "intimate knowledge of who [these workers] were and who were the key people."    According to its representative, "[a] lot of [the workers] worked for Jason Szuch and Hospitality WiFi for many, many years prior to being acquired and then working for [WorldVue]."

WorldVue seems to assume that Szuch's personal knowledge about the workers was confidential information and thus part of its purchase of Szuch's domestic business.    It is here that WorldVue misses a crucial

---

[20] *Id.*

[21] *Anadarko Petroleum Corp. v. Davis*, 2006 WL 3837518, at *16 (S.D. Tex. 2006) (emphasis added). *See also T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 22 (Tex. App—Houston [1st Dist.] 1998, pet. dism'd) (recognizing that an employee may not use confidential or proprietary information acquired *during the course of employment*).

[22] *See, e.g., Wardlaw v. Inland Container Corp.* 76 F.3d 1372, 1379 (5th Cir. 1996) (suggesting that information is not confidential when the party has personal knowledge); *cf. Smith v. Nerium Int'l, LLC,* No. 05-18-00617-CV, 2019 WL 3543583, at *11 (Tex. App.—Dallas Aug. 5, 2019, no pet.) (concluding that information about who the company considered as the best salespeople was confidential information when the parties at issue had no prior personal knowledge).

preliminary step—to have purchased Szuch's personal knowledge about the employees, such knowledge must be considered "confidential information" in the first place.    Such information, however, is not confidential. Information that Szuch acquired *before* WorldVue purchased Hospitality WiFi LLC, the domestic business—personal knowledge that was in Szuch's "head" and "heart"—is not confidential information.    Accordingly, although WorldVue's purchase of Szuch's domestic business included "confidential information," it did not purchase Szuch's personal knowledge.

Likewise, under the 2024 Asset Purchase Agreement, Szuch did not sell such information to WorldVue.  In this Agreement, the Parties agreed that WorldVue would own *WorldVue's* "employee" and "contractor" intellectual property and that Szuch retained ownership of its "employee and personnel files," and "[a]ll *Szuch['s]* employee" and "contractor" information.  Szuch's personal knowledge about the employees did not become WorldVue's upon sale.  Rather, the agreement makes clear: it is Szuch's.    However, WorldVue's company information—such as its assessments of its workers' skills, value, or otherwise, developed by WorldVue after the 2022 and 2024 transactions—is confidential, and Szuch is properly enjoined from using such information.

To the extent the district court's preliminary injunction enjoins Szuch from using information he had before the 2022 acquisition, it should be modified.

## B

To obtain injunctive relief, a movant must also show "a substantial threat of irreparable injury if the injunction [is] not granted."[23]  Irreparable

---

[23] *Planned Parenthood Ass'n of Hidalgo Cnty. Tex., Inc. v. Suehs*, 692 F.3d 343, 348 (5th Cir. 2012).

injury, or irreparable harm, is "harm for which there is no adequate remedy at law."[24] Under Texas law, "injury resulting from the breach of non-compete covenants is the epitome of irreparable injury."[25] That is because the harm caused is inherently difficult to measure in terms of dollars. This includes loss of customer goodwill, lost customer relationships, and the inability to recruit and train replacements of key personnel within a short period of time.

> The district court found the Szuch Parties' conduct:

> constitutes a threat to the welfare of the Agreements and Worldvue's business as such conduct is contrary to the parties' Agreements and understanding. Such conduct will cause Worldvue to suffer irreparable injury, for which a monetary recover will not compensate. Pursuant to the Settlement Agreement, the parties agreed that such conduct . . . would not require proof of irreparable injury in order for Worldvue to obtain injunctive relief.

The Szuch Parties argue that reliance on a contractual stipulation is insufficient by itself to support a finding of irreparable harm. However, we need not address this issue as there is strong evidence of irreparable harm in the record developed in the district court.

First and foremost, the threat that the covenant regarding recruitment and hiring of WorldVue personnel would be breached was not speculative. The evidence showed unequivocally that the agreement in this regard had

---

[24] *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.,* 710 F.3d 579, 585 (5th Cir. 2013) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

[25] *Am. Express Fin. Advisors, Inc. v. Scott*, 955 F. Supp. 688, 693 (N.D. Tex. 1996).

been breached.  The "[t]he harm was more than imminent; it was actual and ongoing."[26]

The evidence at the hearing also supported a finding that monetary damages would be difficult to quantify due to the loss of reputation and goodwill and the impact on the viability of WorldVue's business if WorldVue could not perform satisfactorily.  WorldVue's CEO testified that WorldVue's customer agreements require it "to be responsive in an efficient and quick manner," and that if WorldVue does not "support these customers on a 24/7 basis," then it risks losing individual contracts or master services agreements and harming the reputation of the company.  There was evidence that WorldVue's customers communicated frequently and rapidly about service providers:

> We have approximately 8,000 hotel customers of which each hotel has an individual contract. Now we do -- I brought up master services agreements with major brands, and those agreements are technically a hunting license that allows us to go solicit business from the hotel brands. There are multiple brands, as we all know, throughout the country. But there's ownership groups that we deal with. There are management groups that we deal with, and they often have multiple brands. There's somebody that could have a Hilton, a Marriott, IHG, and it's very key that we support those in an efficient manner. If not, not only will it affect the brand that we're dealing with at the time, but they are a very tight group of people that talk. They are on advisory boards of multiple brands, and they can

---

[26] *Wright v. Sport Supply Grp., Inc.*, 137 S.W.3d 289, 293 (Tex. App.—Beaumont 2004) ("Issue two contends SSG failed to present any evidence it would suffer irreparable injury. The record clearly shows probable and imminent injury.  Wright admitted he was selling Riddell sporting goods to former SSG customers in his old SSG territory. Thus, '[t]he harm was more than imminent; it was actual and ongoing.'") (quoting *NMTC Corp. v. Conarroe*, 99 S.W. 3d 865, 869 (Tex. App.—Beaumont 2003)).

go talk to the other brands and say WorldVue is not supporting us properly and it could really affect our business.

WorldVue's contracts with customers required rapid responses within set time frames, and failure to meet those metrics would result in the loss of that customer's business. It is highly likely, the evidence showed, that word of such failures would spread rapidly. The Szuch Parties' recruitment of WorldVue call service agents, who are essential to providing these services, would hamper WorldVue's ability to operate its business successfully. This is especially so where the Szuch Parties could use confidential information, including the salaries and skillsets of key WorldVue staff, for recruitment efforts before WorldVue could recruit new or additional personnel during the one-year window the restriction on recruitment of existing personnel was in effect.

WorldVue's CEO testified that the support group that was targeted by Szuch Parties had been in place "for years" and had "gone through years of training." They are "very good at what they do." The CEO explained that when WorldVue acquired Hospitality WiFi, "they had the support team in place." The former head of customer service for WorldVue, Mark Schaps, explained at the hearing that independent contractors who worked solely for WorldVue worked on its call-in service team, and "they take all inbound calls, initial inbound calls, from all customers or staff that call in." All of those calls came from within the Restricted Area. Schaps testified it was "very difficult" to replace someone on the service team at WorldVue because "hospitality industry itself is a very niche market." The service team members required both technical, "people" and communication skills because they spoke directly not only with hotel staff but with guests when technical issues arose. The CEO confirmed that "[i]n order to find a replacement, we would have to recruit, somehow recruit them. There would be a lot of training." "It would take time, energy, effort. Productivity would

be disrupted from the employees that are having to spend time to train these people." When asked "[i]s there any way to put a number on that that you know of," the CEO responded, "I don't know how to put a number on that." He further explained the disruptions the loss of key people had on productivity and reiterated that the loss to the business could not be valued in dollars and cents.

The Szuch Parties argue that WorldVue's assertions of future harm are speculative because Worldview has not experienced losses following the departure of the four recruited workers in October 2024 and that there is no evidence the Szuch Parties would continue to solicit WorldVue employees beyond those four. But this argument fails to acknowledge that the Szuch Parties were subject to a TRO beginning in November 2024 which prohibited it from continuing to recruit WorldVue's workers. Additionally, Jason Szuch admitted he would potentially solicit WorldVue's workers as he continued to grow Szuch Holdings.

The Szuch Parties have themselves acknowledged the irreparable harm their recruitment efforts would cause WorldVue. Just before the workers accepted offers to leave WorldVue, the Vice President of Global Business Development for the Szuch Parties noted in an email the workers' readiness to "jump ship" and his plans to "sit now and enjoy the fireworks." Another Szuch Parties employee responded with an image of a little girl smiling in front of a burning house. The clear implication of these emails was that the Szuch Parties expected that the viability of WorldVue's business would be threatened when key WorldVue personnel were poached in violation of the settlement agreement. Griffin testified that the Szuch Parties sought to hire WorldVue's "good independent contractors" who "provided a benefit to WorldVue" and he believed it was possible that "if those independent contractors stopped providing services to WorldVue, that would have a negative impact on its business." Just days after the Settlement

Agreement closed, Jason Szuch wrote in an email that WorldVue "will be out of WiFi in less than a year," then in the next line wrote, "Don't let them know we are talking to Damian." At the hearing, Szuch confirmed that at the time he wrote this email, providing WiFi services to hotels was a "major component" of WorldVue's business at that time, and Szuch was predicting WorldVue would be "out of business [the business Szuch sold to WorldVue] in less than a year." He also confirmed that the reference to "Damian" was a WorldVue support team member the Szuch Parties were recruiting.

The dissenting opinion maintains that we must remand this case to the district court for fact-finding regarding irreparable injury. Our court has long recognized in cases regarding injunctive relief that "'[w]hen the record can be intelligently reviewed, the absence of factual findings may be overlooked by the appellate court,'"[27] and that "'[w]hether a full understanding is possible goes 'not ... to jurisdiction but to our discretion.'"[28] Further, we note:

> The trial court's failure to discuss each party's contentions does not make the findings inadequate or suggest that the court failed to understand the propositions. ... The reviewing court will presume that the judge considered all the evidence and relied on the evidence that supported the findings and rejected the evidence that did not support the findings, unless the judge has stated otherwise.[29]

---

[27] *Boerschig v. Trans-Pecos Pipeline, L.L.C.*, 872 F.3d 701, 706 (5th Cir. 2017) (alteration in original) (quoting *Brown v. Vance*, 637 F.2d 272, 280–81 (5th Cir. 1981)).

[28] *Id.* (alterations in original) (quoting *Golf City, Inc. v. Wilson Sporting Goods, Inc.*, 555 F.2d 426, 434 (5th Cir. 1977)).

[29] 9 Moore's Federal Practice § 52.15[2][b], at 52-52 through 52-53 (3d ed. 2024) (citing, *inter alia*, *ViCon, Inc. v. CMI Corp.*, 657 F.2d 768, 772 (5th Cir. Unit A Sept. 1981)).

Assuming, without deciding, that the district court failed to make factual findings regarding irreparable injury, a full understanding of that issue is possible on the record developed at the hearing in the district court. In the present case "the record is exceptionally clear and remand would serve no useful purpose."[30]

## C

Third, the movant must show "that their substantial injury outweighed the threatened harm to the party whom they sought to enjoin."[31] In WorldVue's application for a preliminary injunction, it contended that the Szuch Parties would not be harmed by having to abide by their bargained-for legal obligations not to solicit WorldVue's employees and use or disclose confidential information. The Szuch Parties argue that it has been prevented from hiring employees constructively terminated by WorldVue and harmed by having to sever its working relationship with at least four individuals named in the injunction. However, the substantial injury to WorldVue discussed above outweighs the limited harm the Szuch Parties may experience in complying with the noncompete covenant in the Settlement Agreement and not soliciting WorldVue's personnel for one year. WorldVue's current personnel are essential to its business, and the Szuch Parties can hire employees aside from those prohibited by the injunction. Accordingly, the irreparable harm WorldVue faces should the Szuch Parties poach their current personnel outweighs the harm the Szuch Parties face by being denied access to WorldVue's personnel. Additionally, with respect to the prohibition on the use and disclosure of confidential information,

---

[30] *White v. Carlucci*, 862 F.2d 1209, 1210 n.1 (5th Cir. 1989) (citing *Davis v. United States*, 422 F.2d 1139, 1142 (5th Cir.1970)).

[31] *Planned Parenthood Ass'n of Hidalgo Cnty. Tex., Inc. v. Suehs*, 692 F.3d 343, 348 (5th Cir. 2012).

No. 24-20571

WorldVue is correct in asserting that the Szuch Parties will not be harmed by upholding their bargained-for contractual obligations.

## D

Finally, the movant must show "that granting the preliminary injunction would not disserve the public interest."[32]  The Szuch Parties argue the injunction contravenes the public's interest because it impacts an individual's right to pursue their chosen employer.  However, it is "well-established in Texas that reasonable noncompete clauses in contracts pertaining to employment are not considered to be contrary to public policy."[33]  Their enforcement therefore does not disserve the public interest. Additionally, enforcing the contractual restraint on confidential information merely holds private parties to their obligations and does not disserve the public interest.

\* \* \*

We AFFIRM the preliminary injunction, except that we MODIFY it to state:

> The term "confidential information," as used in this order, does not include the Szuch Group's personal knowledge regarding the identity of personnel who worked for or with WorldVue.

The mandate will issue immediately.

---

[32] *Suehs*, 692 F.3d at 348.

[33] *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 771 (Tex. 2011).

25

No. 24-20571

Jᴀᴍᴇs L. Dᴇɴɴɪs, *Circuit Judge*, dissenting:

In a preliminary injunction case, the requisite elements—including irreparable injury—must be found by the district court, for factfinding lies with the trial court alone. Appellate review for abuse of discretion presupposes that the district court has exercised judgment in making those findings. Here, however, the district court grounded its finding of irreparable injury solely on a contractual stipulation and made no independent evidentiary findings. The majority opinion attempts to fill that gap by supplying its own findings, but that is not our role. With no exercise of discretion to which we may defer, I would vacate the preliminary injunction and remand for the district court to assess irreparable injury in the first instance. I respectfully dissent.

*      *      *

This appeal arises from the district court's grant of a preliminary injunction, which we review for abuse of discretion. *Ante*, at 7. Under *Winter v. Natural Resources Defense Council, Inc.*, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." 555 U.S. 7, 20 (2008). Here, the district court's finding of irreparable harm rested solely on the parties' contractual stipulation, without any analysis of the evidence. That is legally insufficient. Our sister circuits who have addressed the issue have held that a stipulation standing alone is insufficient to establish irreparable injury, although it may be considered as evidence in the court's broader inquiry. *See, e.g.*, *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1266 (10th Cir. 2004); *Smith, Bucklin & Assocs. v. Sonntag*, 83 F.3d 476, 481 (D.C. Cir. 1996); *Baker's Aid v. Hussmann Foodservice Co.*, 830 F.2d 13, 16 (2d Cir. 1987). After all,

26

equitable relief flows from the court's authority, not the parties' private agreement. *Winter*, 555 U.S. at 32 (underscoring that preliminary injunctions are a matter of judicial discretion, not legal entitlement).

The majority opinion, however, sidesteps this infirmity, reasoning that "evidence of irreparable harm" exists elsewhere in the record. *Ante*, at 19. But the district court did not examine that supposed evidence and find it sufficient for injunctive purposes. In effect, the majority supplies at the appellate level the predicate findings that the district court was required to make. That is clear legal error for two reasons.

*First*, factfinding belongs to the trial court, not the court of appeals. *See Maine v. Taylor*, 477 U.S. 131, 144–45 (1986) ("Factfinding is the basic responsibility of district courts, rather than appellate courts."). Appellate courts do not weigh evidence, determine credibility, or sift the record for support that the trial court never identified. "Injunctive relief is, by its very nature, fact-sensitive and case-specific. For that reason, the court of appeals ordinarily will not uphold a preliminary injunction on a ground that was not fully addressed by the trial court." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 13 (1st Cir. 2002) (collecting cases); *see also* 9 Wright & Miller, Federal Practice & Procedure § 2576 n.1 (3d ed. 2025).

*Second*, the abuse-of-discretion standard presupposes that the district court has actually exercised discretion by making factual findings and balancing the relevant factors. Where the district court has not done so, there is nothing for us to review with deference. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 305 (D.C. Cir. 2006) (explaining that because the balancing of preliminary-injunction factors is reviewed for abuse of discretion, the absence of factual findings prevents the appellate court from supplying them itself). By contrast, under de novo review—such as for

summary judgment or a Rule 12(b)(6) dismissal—the appellate court may affirm on any alternative ground supported by the record and presented to the district court. *See, e.g.*, *Cuadra v. Hous. Indep. Sch. Dist.*, 626 F.3d 808, 812 (5th Cir. 2010); *Harris County v. MERSCORP Inc.*, 791 F.3d 545, 551 (5th Cir. 2015). That principle does not translate to abuse-of-discretion review, which turns precisely on the district court's independent exercise of judgment.

To be sure, there may be "occasional exceptions" when the alternative ground involves purely legal questions that do not require factfinding. WRIGHT & MILLER, *supra* § 2576 n.1 (citing *New Comm Wireless*, 287 F.3d at 13). But even in that limited sphere, appellate courts have cautioned against "upholding a preliminary injunction based upon a legal theory not embraced by the district court" because "it is for the district court to determine, in the first instance, whether the plaintiffs' showing on a particular claim warrants preliminary injunctive relief." *Sherley v. Sebelius*, 644 F.3d 388, 398 (D.C. Cir. 2011).[1]

_____

[1] The majority opinion's response rests entirely on distinguishable and, in some instances, unrelated caselaw. In *Boerschig v. Trans-Pecos Pipeline, LLC*, 872 F.3d 701, 706 (5th Cir. 2017), we overlooked a district court's failure to make findings only because the issues on appeal were "purely legal." The same is true of *Brown v. Vance*, 637 F.2d 272, 280–81 (5th Cir. 1981), which presented a "constitutional issue [that was] straightforward and clearly drawn." And *Golf City, Inc. v. Wilson Sporting Goods, Inc.*, 555 F.2d 426, 434 (5th Cir. 1977), did not involve a preliminary injunction at all. While *White v. Carlucci*, 862 F.2d 1209, 1210 n.1 (5th Cir. 1989), did, we recognized only the unremarkable point that, where a district court wholly fails to enter "findings and conclusions on the elements of an injunction," the "proper solution is to remand so that such findings and conclusions may be entered, to give us a basis for review." We also clarified that "we will review an injunction decision in their absence only when the record is exceptionally clear and remand would serve no useful purpose." *Id.* Here, the district court did not entirely fail to consider the irreparable-injury prong; rather, it considered that prong and found irreparable injury for an undisputedly erroneous legal reason—the contractual stipulation. Thus, *White* is inapposite. Finally, in *Davis v. United States*, 422 F.2d 1139, 1142 (5th Cir. 1970), we declined to overlook the district court's lack of factual findings in a preliminary injunction

No. 24-20571

Because the district court articulated no evidentiary basis for irreparable harm beyond the parties' contractual stipulation, affirmance here would collapse abuse-of-discretion review into de novo review and usurp the trial court's role. The proper course is to vacate the preliminary injunction and remand for the district court to make its own findings and exercise its discretion in light of them.

I respectfully dissent.

---

appeal because the facts were disputed, which "totally preclude[d] meaningful appellate review of the issues presented by the issuance of the district court's injunctive order."